FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND** 2014 MAY 29  A 9: 23

U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| CITY OF PROVIDENCE, | ) |
| Plaintiff, | ) |
| v. | ) |
| SANTANDER BANK, N.A., | ) |
| Defendant. | ) |

**CA 14 - 244 ML**

No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

**NATURE OF THE ACTION**

1.      The City of Providence ("Providence" or "City") brings this suit against Santander Bank, N.A. ("Santander" or "Defendant"), pursuant to the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*, and the Equal Credit Opportunity Act, as amended, 15 U.S.C. § 1691 *et seq.*, to seek redress for Santander's pattern or practice of illegal and discriminatory mortgage lending. Santander, formerly known as Sovereign Bank, N.A, ("Sovereign"), is one of the largest mortgage lenders in Providence and New England, and its unlawful lending practice challenged herein is reflected throughout the region.

2.      Specifically, Providence seeks injunctive relief, declaratory relief, and damages for injuries caused by redlining of the City's majority-minority neighborhoods by Santander. These neighborhoods are starved for quality "prime" loans. Prime loans are generally the only type of mortgage loans available today and they are in short supply, especially in minority neighborhoods. Redlining by Santander is one of the leading causes of the lack of adequate mortgage credit in the City's majority-minority neighborhoods.

3.    Santander has been wholly-owned by Banco Santander, S.A., a Spanish company, since January 30, 2009. Banco Santander is one of the largest banks in the world. Prior to the acquisition, Santander (still Sovereign at the time) had a reasonable presence in minority neighborhoods in Providence commensurate with the presence of other lenders. Over the last five years since the takeover, however, Santander's lending in minority neighborhoods has declined precipitously while its lending in predominantly white neighborhoods has grown substantially.

4.    Before the 2009 purchase by Banco Santander, the mortgage applications that Santander received and the mortgage loans that it originated were scattered relatively evenly among predominantly white and majority-minority census tracts in Providence. Since then, however, Santander's applications and originations in majority-minority tracts have declined by over 60% while they have increased significantly in predominantly white tracts (14% for applications and 25% for originations). The result is that Santander's lending activity is now much more heavily concentrated in predominantly white tracts.

5.    This drop-off is due to redlining and is a substantial obstacle to minority neighborhoods' full participation in the housing market recovery and the broader economic recovery underway in other parts of Providence and elsewhere in Rhode Island and the country.

6.    While many banks have seen a reduction in lending to minority neighborhoods due in part to the 2007 decline of subprime lending and the foreclosure crisis, Santander's drop-off since the acquisition has been dramatically larger than that of other leading lenders. The drop-off is especially stark when considered in conjunction with Santander's simultaneous improved performance in predominantly white neighborhoods. Santander's relative change in

performance in minority and white neighborhoods since the acquisition is referred to as a "race gap."

7.      Santander's large race gap is not due to socioeconomic or other external factors. If it were then its peers would have similar race gaps, but they do not. Comparing the race gaps of Santander and RBS Citizens ("Citizens"), its closest peer in the region, is especially telling. If the magnitude of Santander's race gap was due to external factors, then Citizens in particular would have a similar race gap because it is a similar lender operating in the same market. Yet Citizens' race gap is much smaller than Santander's.

8.      Likewise, Santander's dramatic decline in minority neighborhoods is not due to an absence of qualified borrowers. Many potential borrowers in majority-minority neighborhoods are qualified for prime loans, but Santander is choosing not to lend to them. Data regarding prime lending shows that lenders that have continued to make prime loans in majority-minority neighborhoods have identified an ample supply of qualified borrowers.

9.      Santander's and Citizens' very different race gaps reflect their very different approaches to American laws. When Citizens was taken over by a foreign company (the Royal Bank of Scotland) its new owner took care to understand and comply with United States fair lending laws, specifically discussing them with regulators. Santander's new owners did not. That is consistent with Banco Santander's disregard for laws that protect consumers elsewhere in the United States and in other countries in which it maintains operations. Indeed, Banco Santander has repeatedly been charged with engaging in unlawful and anti-consumer practices.

10.     Santander's lending activity in Boston and throughout New England, and the change in that activity since it was taken over by Banco Santander, reflects the same pattern as its activity in Providence. Santander's focus in Providence on predominantly white

neighborhoods and its disregard for majority-minority neighborhoods is part of a broader and intentional redlining strategy. As Sovereign it was willing to make loans in majority-minority neighborhoods, but under Banco Santander's ownership it is not.

11.     Declarations attached to this Complaint further confirm that Santander's poor performance in majority-minority neighborhoods is the result of an intentional decision to avoid these neighborhoods, and not external factors. The declarations are from a senior state government official and senior officials at three non-profit community development corporations that work to improve the City's majority-minority neighborhoods. These officials state that other lenders like Citizens are actively engaged in efforts to reach potential borrowers in these neighborhoods, but that Santander is not. As one puts it, "[c]ompared to their competitors, Santander's absence stands out." Attach. B ¶ 9.

12.     The harm suffered by Providence as a result of Santander's redlining of minority neighborhoods is particularly significant because prime loans are so desperately needed in these communities and in short supply. The City is directly injured by the lack of sufficient mortgage credit in its majority-minority neighborhoods in at least two ways.

13.     First, insufficient credit suppresses home prices. This suppresses the City's property tax revenue, which is based on property values.

14.     Second, the lack of sufficient credit prevents organizations like the community development corporations, as well as others, from rehabilitating and restoring to productive use as many vacant houses as they would otherwise restore. Providence must provide a multitude of increased and costly municipal services at vacant properties.

15.     Because it is a major contributor to the lack of sufficient mortgage credit in the City's majority-minority neighborhoods through redlining, Santander is responsible for a

significant portion of the financial harm suffered by the City as a result of insufficient credit. That portion can be quantified. Providence does not seek to hold Santander responsible for injuries caused by insufficient credit attributable to any other lender or to general economic conditions.

16.     Santander's ongoing failure to make mortgage loans available to residents of majority-minority neighborhoods in a manner consistent with how it makes mortgage loans available to residents of predominantly white neighborhoods will, absent judicial relief, continue to cause direct and substantial harm to Providence.

## PARTIES

### A.     Plaintiff City of Providence

17.     Plaintiff City of Providence is a municipal corporation organized pursuant to Article XIII of the Rhode Island Constitution. Providence is authorized by R.I. Gen. Laws § 45-15-2 to institute suit.

### B.     Defendant Santander Bank, N.A.

18.     Defendant Santander Bank, N.A. was known as Sovereign Bank, N.A. until its name recently changed to match the name of its parent, a Spanish company called Banco Santander, S.A. ("Banco Santander"). The name change took place on October 17, 2013, but Banco Santander has owned Santander Bank, N.A. since January 30, 2009.

19.     Defendant Santander Bank, N.A. is organized as a national banking association under the laws of the United States. It became a national banking association on January 26, 2012. Santander's corporate headquarters are located in Boston, Massachusetts. Santander also identifies Wilmington, Delaware as its principal place of business. Santander maintains branches and other offices in the State of Rhode Island and the City of Providence for the purposes of

soliciting applications for and making residential mortgage loans and engaging in other business activities. In acting or omitting to act as alleged herein, Santander was acting through its employees and/or agents, and is liable on the basis of the acts and omissions of its employees and/or agents.

20.     Santander was founded in 1902 as a building and loan association in Pennsylvania. It expanded into New England in 2000 when it acquired 285 branches from FleetBoston Financial Corporation (including branches in Rhode Island), a consumer loan center in Providence, and other offices in Rhode Island. At the time it was still known as Sovereign Bank and was not connected to Banco Santander.

21.     Santander is now a regional bank focused on New England and Mid-Atlantic states. Pursuant to the federal Community Reinvestment Act, Santander has designated the Boston-Worcester-Manchester MA-RI-NH Combined Statistical Area ("Boston CSA"), as within its "Assessment Area," which generally means the area of its operations and customers.[1] The Boston CSA includes Providence. The Boston CSA accounts for approximately 40% of Santander's mortgage business, or $2.7 billion in loans annually.

22.     Santander had $74 billion in assets as of the end of the third quarter of 2013.

23.     The map on page 7 shows Santander's service areas and its 723 branch locations in New England and the Mid-Atlantic, including 314 branches in New England. The map is labeled "Sovereign Branches" because it predates the name change to Santander.

---

[1] Combined Statistical Areas are defined by the Census Bureau and are larger than Metropolitan Statistical Areas.



| Northeastern NE | 161 Branches |
|---|---|
| Southern & Western NE | 153 Branches |
| Metro NY & Northern NJ | 135 Branches |
| PA East & NJ Central | 154 Branches |
| PA West & Maryland | 120 Branches |
| **Total Sovereign Branches** | **723 Branches** |

24.     Santander has approximately 21 branches in Providence County and is one of the most active mortgage lenders in the City. For the period 2009 to 2012, it received 4.50% of all mortgage applications in Providence reported to regulators under the federal Home Mortgage Disclosure Act ("HMDA"). It originated 5.52% of all mortgage loans in Providence reported under HMDA during the same period. This gives Santander the fourth largest market share of applications and the fourth largest market share of originations in Providence.

25.     Santander is also one of the most active mortgage lenders in the State of Rhode Island. It ranked fifth in market share in the State during the 2009 to 2012 period, receiving 3.2% of all mortgage applications. Santander has approximately 32 branches in Rhode Island.

26.     Within the Boston CSA – *i.e.*, the largest component of Santander's self-designated Assessment Area – it ranked fifth in market share during the 2009 to 2012 period. Santander received 3.16% of all mortgage applications in this area.

27.     Santander is 81%-owned by Santander Holdings USA, Inc. ("SHUSA"), a bank holding company. It is 19%-owned by Independence Community Bank Corp., a wholly-owned subsidiary of SHUSA. SHUSA is a Virginia corporation with its principal place of business in Boston, Massachusetts. SHUSA is wholly-owned by Banco Santander. Banco Santander is an international retail and commercial bank headquartered in Spain. It has approximately 14,392 branches worldwide. Banco Santander is the largest bank in the euro zone and manages approximately $1.2 trillion in deposits from 102 million customers.

28.     Banco Santander has placed many of its own officials in key positions at Santander and SHUSA, including the following:

- Romàn Blanco, the President and CEO of both Santander and SHUSA, was President and CEO of Santander Bancorp and Banco Santander Puerto Rico (2012 to 2013), Vice President of Banco Santander Banespa in Brazil (2004 to 2007), and Country Head of Banco Santander Columbia (2007 to 2012);

- Jorge Morán, Blanco's predecessor as Santander CEO and its former General Manager, was Banco Santander's United States Country Head and a Member of Banco Santander's Executive Committee;

- Juan Carlos Alvarez, a Member of Santander's and SHUSA's Executive Management Committees, their former Executive Vice President and Corporate Treasurer (2009 to 2013), and SHUSA's Chief Financial Officer, was Global Head of Treasury and Investments for Santander International Private Banking Unit (2006 to 2009) and Head of Treasury and Investments for Santander Suisse (2000 to 2006);

- Nuno Matos, SHUSA's Managing Director-Retail Banking and a Member of Santander's Board of Directors in 2013, is a Banco Santander employee and formerly served as an executive of Santander-Portugal;

- Guillermo Sabater, the Senior Executive Vice President and Comptroller of both Santander and SHUSA and a Member of their Executive management Committees, has been with Banco Santander for 19 years, including as Chief Financial Officer of its operations in Chile (2006 to 2009) and Controller of its Consumer Finance Division in Spain (2003 to 2006);

- Juan Dávila, Santander's Specialty Managing Director and former Chief Risk Management Officer, served as a Banco Santander executive in Spain;

- Alberto Sánchez, a Member of Santander's Board of Directors and its Executive Management Committee, has held numerous executive positions with Banco Santander since 1997;

- Juan Andres Yanes, a Member of Santander's and SHUSA's Boards of Directors since 2009 and their Chief Risk Officer, is a Member of the Board of Directors of Banco Santander International and was formerly Banco Santander's Global Head of Risk Management;

- Carmen Briongos, a Member of Santander's and SHUSA's Executive Management Committees and their Managing Director of Human Resources and Organizational Efficiency, held senior management positions with Santander Brasil and Santander Central Hispano before serving as Chief of Technology and Operations and Vice President of Special Projects for Santander Columbia (2008 to 2012);

- Julio Somoza, a Member of Santander's and SHUSA's Executive Committees and their Managing Director of Technology and Operations, was Banco Santander's Director of Market Risk and Global Business (2008) and held positions at Banco Santander Central Hispano, including in Madrid;

- Gonzalo de Las Heras, a Members of Santander's and SHUSA's Boards of Directors, is the Chairman of: Santander Bancorp, Puerto Rico; Banco Santander International, Miami; Santander Bank and Trust Limited, Bahamas; and Banco Santander (Suisse); and was a Banco Santander Executive Vice President from 1990 to 2009; and

- Carlos Garcia, Eduardo J. Stock, and Nuno G. Matos, former Members of Santander's Board of Directors, are current or former Banco Santander executives.

29.     In the United States and elsewhere, Banco Santander has repeatedly been charged with engaging in unlawful and anti-consumer practices. From 2011 to 2012, the Texas Attorney General received over 600 complaints about abusive collection practices in Banco Santander's retail finance operation, Santander Consumer USA, Inc., which is based near Dallas. The Better Business Bureau of Metropolitan Dallas received over 1,700 such complaints during the same period.

30.     In England, Banco Santander generates more customer complaints and lower customer satisfaction ratings than any other bank.

31.     A lawsuit pending against Santander Chile alleges that after providing mortgage relief to homeowners for three to four years, it charged the homeowners ten times what they had saved through the relief program.

32.     A lawsuit against Santander Spain alleged that it misled investors about the nature of bonds worth over 7 billion euros that it sold to customers who were seeking certificates of deposit. The bonds lost 70 percent of their value in just a few months, and Santander Spain eventually agreed to convert them to stock in Banco Santander.

33.     Complaints led Santander Mexico to stop selling a health insurance product that required patients to charge medical expenses to a Banco Santander credit card for the insurance to apply; consumers complained that proper claims were then denied, leaving them to pay not

10

only the claims but interest, as well.  Santander Mexico has also been accused of using illegal debt collection practices.

34.     Banco Santander's chief executive, Alfredo Sáenz, resigned in April 2013 after Spain's Supreme Court reinstated a criminal conviction against him for falsely accusing three businessman of failing to pay their loans.

35.     Santander paid over $3 million in 2012 to settle a class action regarding loan fees that allegedly violated Missouri law.

36.     Banco Santander's corporate misconduct around the globe is consistent with the discriminatory misconduct of its subsidiary, Defendant Santander Bank, N.A., addressed herein.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1691e(f); 28 U.S.C. §§ 1331, 1343; and 42 U.S.C. § 3613.

38.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant conducts business in and is a resident of the district and a substantial part of the events and omissions giving rise to the claims occurred in the district.

## FACTUAL BACKGROUND

### A.     The Rise and Decline of Subprime Lending

39.     The rise and decline of subprime lending over the last fifteen to twenty years has had dramatic effects on the availability and quality of mortgage loans in minority communities.

40.     Before subprime lending, when the main type of residential mortgage lending was prime, many lenders were inactive in high-minority neighborhoods despite an ample supply of creditworthy and responsible people in need of mortgage credit.  Minority neighborhoods were

11

redlined, first pursuant to explicit discriminatory policies and later due both to the vestiges of

those policies and continuing discriminatory attitudes, assumptions and stereotypes.

41.     Subprime lending developed in the mid-1990s as a result of technological

innovations in risk-based pricing and in response to the demand for credit by borrowers who

were denied prime credit by traditional lenders.  These innovations gave lenders the ability to

adjust the price of loans to match the different risks presented by borrowers with blemished

credit whose records did not meet the standards for prime loans.  Subprime lending grew rapidly,

especially in minority communities long denied equal access to prime lending.

42.     When done responsibly, subprime lending made credit available more broadly

than had been the case with prime lending.  A paper published by the Federal Reserve in 2006

stated, "The promise of subprime lending is that it can provide the opportunity for

homeownership to those who were either subject to discrimination or could not qualify for a

mortgage in the past."[2]

43.     At the same time, however, subprime lending created opportunities for

unscrupulous lenders to engage in abusive and predatory lending practices that harmed

borrowers.  During the rise of subprime lending, the federal government found that such

practices were "concentrated in the subprime mortgage market."[3]

44.     The problem of predatory practices in subprime mortgage lending became

particularly acute in minority communities because of "reverse redlining," *i.e.*, targeting

residents in certain geographic areas for credit on unfair terms due to the racial or ethnic

---

[2] Souphala Chomsisengphet and Anthony Pennington-Cross, *The Evolution of the Subprime Mortgage Market* (Jan./Feb. 2006), at 31 (*available at* https://research.stlouisfed.org/publications/review/06/01/ChomPennCross.pdf).

[3] United States Department of Housing & Urban Development and United States Department of the Treasury, *Curbing Predatory Home Mortgage Lending* (2000), at 1 (*available at* http://www.huduser.org/ Publications/pdf/treasrpt.pdf) ("HUD/Treasury Report").

composition of the area. Many studies showed that, even after controlling for creditworthiness and other legitimate underwriting factors, subprime loans and the predatory practices often associated with subprime lending were disproportionately targeted at minorities and minority neighborhoods. [4]

45.     Litigation confirmed the widespread statistical findings of reverse redlining in the mortgage industry. For example, cases filed by Baltimore and Memphis alleged that Wells Fargo targeted minority neighborhoods for a range of predatory subprime practices during the subprime boom years. Testimony from former Wells Fargo employees explained that, for example, the company targeted its subprime marketing at minority zip codes and minority institutions such as African-American churches; steered people who qualified for prime loans into more expensive subprime mortgages; lied to minority customers to increase their interest rates and misled them about prepayment penalties; added unnecessary fees that did not benefit borrowers; and falsified loan files to make subprime loans to borrowers who could not afford them.

---

[4] *See* Gregory D. Squires, et al., *Segregation and the Subprime Lending Crisis* (Apr. 16, 2009) (*available at* http://www.kansascityfed.org/publicat/events/community/2009carc/Hyra.pdf); Abt Associates, *Using Credit Scores to Analyze High-Cost Lending in Central City Neighborhoods* (2008); Calvin Bradford, Center for Community Change, *Risk or Race? Racial Disparities and the Subprime Refinance Market* (May 2002), at vii-ix (*available at* http://www.knowledgeplex.org/redir.html?id=1032&url= http%3A%2F%2Fwww.knowledgeplex.org%2Fkp%2Fr eport%2Fréport%2Frelfiles%2Fccc_0729_risk.pdf); Center for Responsible Lending, *Borrowers in High Minority Areas More Likely to Receive Prepayment Penalties on Subprime Loans* (Jan. 2005), at 1-2 (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr004-PPP_Minority_Neighborhoods-0105.pdf); Debbie Gruenstein Bocian, et al., Center for Responsible Lending, *Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages* (May 31, 2006), at 16-17 (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/rr011-Unfair_Lending-0506.pdf); HUD/Treasury Report, at 72 (*available at* http://www.huduser.org/Publications/pdf/treasrpt.pdf); HUD, *Unequal Burden: Income and Racial Disparities in Subprime Lending in America* (2000) (*available at* http://archives.hud.gov/reports/subprime/subprime.cfm); National Community Reinvestment Coalition, *The Broken Credit System: Discrimination and Unequal Access to Affordable Loans by Race and Age: Subprime Lending in Ten Large Metropolitan Areas* (2003), at 31-34 (*available at* http://www.ncrc.org/images/stories/pdf/research/ncrcdiscrimstudy.pdf); Howell E. Jackson & Jeremy Berry, "Kickbacks or Compensation: The Case of Yield Spread Premiums" (Jan. 8, 2002), at 9, 125 (*available at* http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf).

46.     The United States Department of Justice investigated and found that Wells Fargo
discriminated against tens of thousands of African-American and Hispanic mortgage customers
from 2004 to 2009, including by steering thousands who qualified for prime loans into more
expensive subprime loans. Wells Fargo agreed to a settlement with the United States worth
$234.3 million. Wells Fargo likewise settled the cases brought by Baltimore and Memphis for
millions of dollars.

47.     Other cases provide further confirmation that, as subprime lending developed, so
did reverse redlining.

48.     The rise of subprime lending and reverse redlining coincided with a sustained rise
in housing prices. Housing prices and mortgage lending hit a peak, and in 2006 began to decline.
A sharp increase in delinquent and foreclosed subprime loans quickly followed and caused the
subprime mortgage industry to collapse during the latter part of the following year. Lenders that
had focused on the subprime market largely went out of business or were forced to sell their
business. Subprime mortgage lending all but disappeared and has not yet returned to significant
levels. This is largely because investors are no longer interested in buying subprime loans, or
bonds backed by them, from front-line lenders like Santander.

49.     The problems in the subprime market precipitated a wave of foreclosures that
began in 2007 and continued unabated until early 2009.

**B.      The Impact on Minority Communities Nationally and the Return to Redlining**

50.     Prime loans have become even more difficult to obtain in minority communities
at the same time that subprime lending has virtually disappeared. The impact of this on minority
communities has been profound and destructive. Many homeowners saddled with predatory
loans and/or facing diminished employment opportunities have already lost their homes to

14

foreclosure. Many more who continue to struggle to avoid foreclosure could do so with fair and affordable prime loans, but these loans are not widely available in minority neighborhoods.

51.    As a result, foreclosures remain disproportionately concentrated in minority neighborhoods. One 2011 study found that, nationally, 19.5% of loans made from 2004 to 2008 in neighborhoods that were over 75% minority had already been foreclosed on, were in the process of being foreclosed on, or were at least 60 days delinquent.[5] The figure was even higher in Rhode Island – 22.1%.[6] The pace of foreclosures remains over twice as high as the historical norm.[7]

52.    Between foreclosures and depressed housing prices, substantial equity has been and continues to be drained from minority communities. The need for quality loans in these neighborhoods to help them recover is clear, but numerous studies demonstrate that this need is not being met.

53.    One study of prime lending in seven metropolitan areas between 2006 and 2008 found that: "In neighborhoods of color . . . access to prime, conventional mortgage loans has declined precipitously – to a much greater degree than in predominantly white neighborhoods . . . . Prime lending in communities of color decreased by 60.3 percent, compared to 28.4 percent in predominantly white neighborhoods."[8]

---

[5] *See* Debbie Gruenstein Bocian, et al., Center for Responsible Lending, *Lost Ground, 2011: Disparities in Mortgage Lending and Foreclosures* (Nov. 2011), at 29 (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/Lost-Ground-2011.pdf).

[6] *See* Center for Responsible Lending, *State Rates of Completed Foreclosure and Serious Delinquency, by Neighborhood Minority Concentration* (Nov. 2011), at 4 (*available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/lost-ground-State-data-by-neighborhood-minority-concentration.pdf).

[7] CoreLogic National Foreclosure Report (Feb. 2014), at 2 (*available at* http://www.corelogic.com/research/foreclosure-report/national-foreclosure-report-february-2014.pdf).

[8] *Paying More for the American Dream IV: The Decline of Prime Mortgage Lending in Communities of Color* (May 2010), at i (*available at* http://nedap.org/resources/documents/PayingMoreIV_Final.pdf).

54.     The study found that the disparity was even greater with respect to loans for refinancing: "Prime refinance lending declined by 66.4 percent in neighborhoods of color, and by 13.9 percent in predominantly white areas." Access to refinance loans, with "low interest rates and reduced monthly mortgage payments," is especially important for people trying to avert foreclosure and keep their homes. *Id.* at i, 4.

55.     A follow-up study found a strong recovery in refinance lending already underway in 2009 in the same seven metropolitan areas' predominantly white neighborhoods, with lending more than doubling from 2008. But in the same year it declined by an additional 17% in communities of color.[9]

56.     Another study found that, from 2004 to 2009, "access to mortgage credit for African-Americans and Latinos has plummeted compared to non-Hispanic whites."[10] "[T]he dollar volume of prime loans made to African-Americans and Latinos declined 76.24% and 76.45% respectively," but by only 26.7% to whites. *Id.* at 17. Prime lending to whites was rebounding in the final year of the study, but declining further for African Americans and Latinos. In 2009, 86.54% of prime mortgage loans went to whites (their highest share of the market in the six years studied) while only 6.39% went to African Americans and Latinos combined (their lowest share in the six years studied). *Id.* at 21.

57.     The studies likewise demonstrate substantial disparities in denial rates between minority and white communities since the collapse of subprime lending. Analyzing 2012 data,

---

[9] *See Paying More for the American Dream V: The Persistence and Evolution of the Dual Mortgage Market* (Apr. 2011), at i (*available at* http://calreinvest.org/system/resources/W1siZiIsIjIwMTEvMDYvMTYvMTVfMDNfMT FfMTM0X1BheWluZ01vcmVWUmVwb3J0X0ZJTkFMLnBkZiJdXQ/PayingMoreVReport%20-%20FINAL.pdf) ("*Paying for the American Dream V*").

[10] Maurice Jourdain-Earl, *The Foreclosure Crises and Racial Disparities in Access to Mortgage Credit 2004-2009* (Feb. 2011), at 1 (*available at* http://www.compliancetech.com/files/The%20Foreclosure%20Crisis%20and%20 Racial%20Disparities.pdf).

the Federal Reserve found that the denial rates for conventional home purchase loans were

32.0% for African Americans, 20.5% for Hispanic whites, and only 11.6% for non-Hispanic

whites; for conventional refinance loans, the figures were 34.7%, 26.1%, and 17.4%,

respectively.[11]  The study of seven metropolitan areas discussed above found that in 2009,

"[l]enders were roughly two and a half times as likely to deny a conventional refinance loan to

homeowners in communities of color as they were to homeowners in predominantly white

neighborhoods."[12]

58.    Upon information and belief, the disparities shown in paragraphs 51-57 have

continued to the present.  Minority neighborhoods continue to be deprived of equal and adequate

access to prime mortgage credit.

59.    The stark and disproportionate decline in access to prime mortgage credit in

minority communities reflects in large measure a return by some lenders to discriminatory

redlining practices that deprived these communities of vital credit for many decades.  These

lenders are targeting predominantly white communities while disinvesting from minority

communities based on discriminatory assumptions and stereotypes.  It has repeatedly been held

that redlining violates the Fair Housing Act and the Equal Credit Opportunity Act.  The return of

redlining means that the minority communities that were disproportionately targeted for

predatory subprime lending practices are now disproportionately deprived of access to badly

needed prime credit.

---

[11] *See* Federal Reserve Bulletin, *Mortgage Market Conditions and Borrower Outcomes: Evidence From the 2012 HMDA Data and Matched HMDA-Credit Record Data* (Dec. 2011), at 29 (*available at* http://www.federalreserve.gov/pubs/bulletin/2013/pdf/2012_HMDA.pdf).

[12] *Paying for the American Dream V* at i.

60.     The reemergence of redlining was recently addressed by Federal Reserve

Chairman Ben Bernanke.  Chairman Bernanke identified "signs of improvement in the housing

market in most parts of the country," but identified "redlining, in which mortgage lenders

discriminate against minority neighborhoods," as an obstacle to recovery.[13]

**C.     Segregated Living Patterns Make Providence Vulnerable to Redlining**

61.     Minority populations in areas with racially segregated living patterns are

especially vulnerable to redlining.  The greater Providence area and the Boston CSA both fit this

pattern.  This is shown by the maps on the following two pages, which identify minority living

patterns by census tract.  The maps demonstrate that there are many concentrated predominantly

white areas (*i.e.*, less than 30% minority) and many concentrated majority-minority areas (*i.e.*,

50% or more minority) in the greater Providence area and the Assessment Area.

---

[13] Ben Bernanke, Speech at Operation HOPE Global Financial Dignity Summit, *Challenges in Housing and Mortgage Markets* (Nov. 15, 2012) (*available at* http://www.federalreserve.gov/newsevents/speech/bernanke2012 1115a.htm).

## Rhode Island: Percent Minority



Percent Minority

| | < 30% | | 50 - 79.99% |
| | 30 - 49.99% | | > 80% |

Data Source: 2010 US Census, Rhode Island Geographic Information Systems

## Sovereign Assessment Area: Percent Minority



**Percent Minority**

- [ ] < 30%
- [ ] 30 - 49.99%
- [ ] 50 - 79.99%
- [ ] > 80%

Data Source: 2010 US Census, Massachusetts Geographic Information Systems, Rhode Island Geogrphuc Information Systems

20

**D.    Access to Mortgage Credit in Providence's Minority Communities Has Declined Substantially**

62.    Publicly available data reported to federal regulators pursuant to the Home Mortgage Disclosure Act shows that access to mortgage credit in Providence's majority-minority neighborhoods has declined substantially in the last several years.

63.    The decline is demonstrated by comparing the number of mortgage applications and originations in Providence's majority-minority census tracts reported by nine of the ten most active mortgage lenders in Rhode Island (including Santander) during the last years of the subprime period (2006 to 2007) to the number of mortgage applications and originations in the post-subprime period (2009 to 2012, the most recent year for which data has been reported), which coincides with the period of Banco Santander's ownership of Santander.[14]

64.    Using these nine leading lenders (including companies that they acquired during the relevant time period) instead of all lenders is important because some smaller lenders went out of business due to the end of subprime lending and the recession.  Including the applications and originations that those lenders reported before going out of business would skew the results in favor of showing a decline.  These nine leading lenders received 42% of all applications and originated 46% of all mortgages reported under HMDA in Providence from 2009 to 2012.

65.    The following table shows the average number of mortgage applications received and mortgages originated by these nine leading lenders in the 2006 to 2007 period and the 2009 to 2012 period in majority-minority and predominantly white census tracts in Providence, and the percentage change from the earlier to the later time period:

---

[14] Bank of America is the top ten lender excluded from these comparisons.  It is excluded because, in the post-subprime years, it has been intentionally shrinking its presence in certain markets in the country and consolidating its efforts in others.  Its pattern of lending in Providence is consistent with intentional withdrawal from the market as a whole pursuant to that policy, making it an inapt comparator.

|  | Minority population | PROVIDENCE APPLICATIONS | | | PROVIDENCE ORIGINATIONS | | |
|---|---|---|---|---|---|---|---|
|  |  | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Leading Lenders | 0-29.99% | 566 | 672 | +19% | 371 | 459 | +24% |
|  | 50-100% | 1,011 | 632 | -37% | 442 | 262 | -41% |

66.     These figures demonstrate that mortgage credit has become increasingly available to residents of Providence's predominantly white neighborhoods but increasingly unavailable to residents of Providence's majority-minority neighborhoods.

67.     Figures for the top ten lenders (excluding Bank of America) in the Boston CSA (which includes Providence) over the same time period reflect the same pattern:.

|  | Minority population | BOSTON CSA APPLICATIONS | | | BOSTON CSA ORIGINATIONS | | |
|---|---|---|---|---|---|---|---|
|  |  | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Leading Lenders | 0-29.99% | 88,211 | 104,026 | +18% | 55,390 | 70,303 | +27% |
|  | 50-100% | 6,526 | 5,303 | -19% | 2,953 | 2,737 | -7% |

**E.     Santander Is Redlining Providence's Minority Communities**

68.     Redlining by Santander since the January 2009 takeover by Banco Santander (when Defendant was known as Sovereign) is demonstrated by the fact that the change in its lending patterns is significantly more unfavorable to minority communities than its market competitors.  Redlining by Santander has been and continues to be a major contributor to the lack of badly needed prime mortgage credit in Providence's majority-minority neighborhoods. Santander's departure from majority-minority neighborhoods is confirmed in declarations attached hereto and is not the result of external conditions; it is the result of redlining.

69.     Santander's own data reported under HMDA demonstrates that it is engaged in an unlawful pattern or practice of redlining against majority-minority neighborhoods in Providence. The data shows significantly increased lending activity – mortgage applications and mortgage originations – by Santander in predominantly white neighborhoods contemporaneous with dramatic disinvestment from majority-minority neighborhoods.  Comparing the number of applications, not just originations, is important because redlining can be accomplished by using tactics that keep residents of majority-minority neighborhoods from even applying for a mortgage, such as, *inter alia*, limiting advertising and other forms of outreach in these neighborhoods.

70.     HMDA data for Santander's lending activity throughout the Boston CSA reflects the same pattern as the data for its lending activity in Providence.  This is evidence that the data for Providence is not an anomaly but the result of an intentional decision by Defendant – contemporaneous with the takeover by Banco Santander – to engage in redlining.

71.     Socioeconomic and other preexisting conditions do not explain the racial disparities in Santander's lending activity in Providence since the corporate takeover by Banco Santander, S.A.  Santander's racial disparities make Santander an outlier with respect to the top lenders generally and with respect to RBS Citizens, N.A. ("Citizens") specifically.  Santander and Citizens are both among the top five lenders in both Rhode Island and the Boston CSA and have very similar profiles.  If socioeconomic or other preexisting conditions explained the racial disparities in Santander's lending activity, then other lenders would have comparable disparities. Santander is an outlier compared to the other lenders not only with respect to applications and originations, but also with respect to the frequency with which it denies the limited number of applications it takes from Providence's minority residents.  Santander is actively disinvesting

from majority-minority neighborhoods in Providence because of the racial makeup of those

neighborhoods, not because of other factors.

72.     The other leading lenders have maintained higher levels of lending in

Providence's majority-minority neighborhoods without reducing credit standards.  To the

contrary, average credit scores on prime loans in these neighborhoods have increased since

2006/2007 and are only slightly lower than in the City's predominantly white neighborhoods.

Accordingly, an absence of qualified prime borrowers does not explain the racial disparities in

Santander's lending activity in Providence; there are plenty of qualified borrowers but, unlike its

competitors, Santander is not lending to them.

73.     Upon information and belief, the statistical disparities identified in this section for

the period from 2009 through 2012 have continued to the present.

74.     That Santander is engaged in redlining in Providence is further confirmed by

declarations attached to this Complaint from the Housing Commission Coordinator at the Office

of Housing and Community Development in the State of Rhode Island's Department of

Administration Division of Planning and senior officials at three community development

corporations dedicated to the stabilization and revitalization of majority-minority neighborhoods

in Providence.  These declarations are discussed in greater detail below at paragraphs 122-132.

75.     Since its acquisition by Banco Santander, Santander has acted with intentional

and reckless disregard for its obligations under fair lending laws by deciding to increase its

efforts to make prime loans in white areas while simultaneously withdrawing from minority

areas.

1.     **The Location of Santander's Lending Activity Demonstrates That Santander Is Redlining Providence's Minority Communities**

76.     Analysis of HMDA data shows that Santander's disinvestment from majority-minority neighborhoods in Providence following the takeover by Banco Santander has been drastic.  The data further show that, at the same time, Santander has successfully increased its lending activity in predominantly white communities in Providence.  Santander's race gap described in the paragraphs below is significantly greater than that found among its market competitors.

77.     In the 2006 to 2007 period, Santander received an annual average of 140 mortgage applications from majority-minority census tracts in Providence and 74 mortgage applications from predominantly white census tracts in Providence.

78.     In the 2009 to 2012 period, Santander received an annual average of 54 mortgage applications from majority-minority census tracts in Providence and 84 mortgage applications from predominantly white census tracts in Providence.

79.     This means that Santander's applications from majority-minority census tracts decreased by 61% while its applications from predominantly white census tracts increased by 14%.

80.     In the 2006 to 2007 period, Santander originated an annual average of 68 mortgage loans in majority-minority census tracts in Providence and 51 mortgage loans in predominantly white census tracts in Providence.

81.     In the 2009 to 2012 period, Santander originated an annual average of 25 mortgage loans in majority-minority census tracts in Providence and 64 mortgage loans in predominantly white census tracts in Providence.

82. This means that Santander's originations in majority-minority census tracts decreased by 63% while its originations in predominantly white census tracts increased by 25%.

83. The eight maps on pages 27-30 are based on the same data as paragraphs 77-82, as well as parallel data for surrounding communities, and show Santander's redlining of majority-minority neighborhoods in both Providence and the surrounding communities since the corporate takeover. Each page contains a before and after representation of Santander's lending activity. There is one pair of maps for applications in predominantly white census tracts (*i.e.,* less than 30% minority); one pair of maps for applications in all other census tracts (*i.e.,* 30% or more minority); one pair of maps for originations in predominantly white census tracts; and one pair of maps for originations in all other census tracts.

84. The maps on the left represent Santander's lending activity in 2006 to 2007 and show that its applications and originations were scattered relatively evenly among predominantly white and majority-minority census tracts in Providence and the surrounding communities.

85. The maps on the right show that for the period of 2009 to 2012, Santander exited almost entirely from Providence's majority-minority communities. These maps further show that, at the same time, Santander not only maintained but expanded its lending activity in predominantly white communities.

## 2006-2007

## 2009-2012





## Loan Applications: Santander*
## Providence, RI

*Loan points represent the average number of loan applications made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

**Percent Minority**

| | |
|---|---|
| < 30% | 50 - 79.99% |
| 30 - 49.99% | > 80% |

- •   Loan Applications

    Roger Williams Park



## 2006-2007

## 2009-2012

**Loan Applications: Santander***
**Providence, RI**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

Percent Minority

| | |
|---|---|
| < 30% | • Loan Applications |
| 30 - 100% | Roger Williams Park |

## 2006-2007



## 2009-2012

### Loan Originations: Santander*
### Providence, RI

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

**Percent Minority**

| | |
|---|---|
| < 30% | 50 - 79.99% |
| 30 - 49.99% | > 80% |

• Loan Originations

Roger Williams Park



## 2006-2007

## 2009-2012

**Loan Originations: Santander\***
**Providence, RI**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

Percent Minority

| < 30% | ● Loan Originations |
| 30-100% | Roger Williams Park |

86.     The figures in paragraph 65 for the leading lenders collectively and paragraphs 77-82 for Santander are combined in the following table:

|  | minority population | PROVIDENCE APPLICATIONS | | | PROVIDENCE ORIGINATIONS | | |
|---|---|---|---|---|---|---|---|
|  |  | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Leading Lenders | 0-29.99% | 566 | 672 | +19% | 371 | 459 | +24% |
|  | 50-100% | 1,011 | 632 | -37% | 442 | 262 | -41% |
| Santander | 0-29.99% | 74 | 84 | +14% | 51 | 64 | +25% |
|  | 50-100% | 140 | 54 | -61% | 68 | 25 | -63% |

87.     The difference between the percentage change in predominantly white census tracts and the percentage change in majority-minority tracts constitutes a "race gap." For applications, the leading lenders' race gap is 56 points and Santander's race gap is 75 points. For originations, the leading lenders' race gap is 65 points and Santander's race gap is 88 points.

88.     Santander's substantially larger than average race gaps mean that – even though the City is experiencing a collective decline in access to adequate credit from the largest lenders in the State – Santander's lending pattern stands out as being especially favorable to white communities at the expense of minority communities.

89.     The statistics comparing lending activity by Santander in the Boston CSA with lending activity by the leading lenders in the Boston CSA are similar to the results for Providence. This broad region of New England was identified by Santander itself as a region in which its business is focused. That the statistics for the Boston CSA are comparable to the statistics for Providence demonstrates that the Providence statistics are not an anomaly, but

instead are part of a company policy or practice designed to focus Santander's lending business on white communities while intentionally shrinking its business in minority communities.

90.     The map on the following page shows the Boston CSA.

**Boston-Worcester-Manchester, MA-RI-NH Combined Statistical Area**



U.S. DEPARTMENT OF COMMERCE Economics and Statistics Administration U.S. Census Bureau

91.    The following table contains the lending activity statistics for Santander and the

top ten lenders (excluding Bank of America; *see supra* note 14) in the Boston CSA:

|  |  | | BOSTON CSA APPLICATIONS | | | BOSTON CSA ORIGINATIONS | |
|---|---|---|---|---|---|---|---|
|  | minority population | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Leading Lenders | 0-29.99% | 88,211 | 104,026 | +18% | 55,390 | 70,303 | +27% |
|  | 50-100% | 6,526 | 5,303 | -19% | 2,953 | 2,737 | -7% |
| Santander | 0-29.99% | 9,844 | 11,566 | +17% | 6,948 | 9,344 | +34% |
|  | 50-100% | 1,182 | 632 | -47% | 585 | 373 | -36% |

92.    For applications, the leading lenders' race gap is 37 points and Santander's race

gap is 64 points.  For originations, the leading lender's race gap is 34 points and Santander's race

gap is 70 points.

93.    The twelve maps on pages 36-41 are based on the same data as paragraph 91 and

show Santander's redlining of majority-minority neighborhoods in the Boston CSA since the

corporate takeover.[15]  They represent Santander's before and after lending activity in the portion

of the Boston CSA that contains nearly all of the census tracts that are at least 30% minority.

94.    The first six of these maps show Santander's applications in all census tracts in

the Boston CSA (page 36); in 30-100% minority census tracts (page 37); and in 0-30% minority

census tracts (page 38).  The next six maps show Santander's originations in the same manner

(on pages 39-41).

95.    The next eight maps (on pages 42-45) are based on the same data and provide a

detailed view of Santander's lending activity in Boston and the immediately surrounding areas.

---

[15] To enhance readability and for the convenience of the Court, large-scale color copies of all Boston CSA maps included herein are being filed with the clerk's office as an appendix to this Complaint.

96.     Together, these maps show that, as in Providence, Santander has substantially increased its activity in predominantly white communities while dramatically reducing its activity in majority-minority communities.



### 2006-2007

### 2009-2012

**Loan Applications: Santander***
**Boston Consolidated Statistical Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

☐ < 30%    ▨ 50 - 79.99%

☐ 30 - 49.99%    ▨ > 80%

• Loan Applications



## 2006-2007

## 2009-2012

**Loan Applications: Santander***
**Boston Consolidated Statistical Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

< 30%     50 - 79.99%

30 - 49.99%     > 80%

•   Loan Applications

## 2006-2007

## 2009-2012



## Loan Applications: Santander*
## Boston Consolidated Statistical Area

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

< 30%

30 - 100%

• Loan Applications



**2006-2007**

**2009-2012**

## Loan Originations: Santander*
## Boston Consolidated Statistical Area

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

◻ < 30%     ▨ 50 - 79.99%

▨ 30 - 49.99%     ▨ > 80%

• Loan Applications

## 2006-2007

## 2009-2012



### Loan Originations: Santander*
### Boston Consolidated Statistical Area

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

- < 30%
- 30 - 49.99%
- 50 - 79.99%
- > 80%

● Loan Applications

40



**Loan Originations: Santander***
**Boston Consolidated Statistical Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)



## 2006-2007

## 2009-2012

**Loan Applications: Santander***
**Greater Boston Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

**Percent Minority**

- < 30%
- 30 - 49.99%
- 50 - 79.99%
- > 80%

- Loan Applications
- Boston Major Parks



## 2006-2007

## 2009-2012

Loan Applications: Santander*
Greater Boston Area

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

Percent Minority

☐ < 30%

▨ 30 - 100%

• Loan Applications

▨ Boston Major Parks



## 2006-2007

## 2009-2012

**Loan Originations: Santander***
**Greater Boston Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

**Percent Minority**

☐ < 30%          ▨ 50 - 79.99%          • Loan Applications

☐ 30 - 49.99%     ■ > 80%               ▨ Boston Major Parks



**2006-2007**

**2009-2012**

**Loan Originations: Santander\***
**Greater Boston Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

Percent Minority

< 30%

30 - 100%

○  Loan Applications

Boston Major Parks

97.    Upon information and belief, redlining by Santander in Providence is a
manifestation of a decision by Santander to engage in redlining in a broader geographic area.
Santander is actively and intentionally growing its mortgage business in predominantly white
areas of Providence and New England at the same time that it is actively and intentionally
shrinking its mortgage business in majority-minority areas of Providence and New England.

### 2.    The Location of Lending Activity by Santander's Peer, RBS Citizens, Demonstrates That Santander's Pattern of Racially Disparate Lending Is Not the Result of Extraneous Factors

98.    RBS Citizens' pattern of lending activity further demonstrates that Santander is an
outlier. Citizens has had a much smaller drop-off in lending activity in majority-minority
neighborhoods than Santander and has a much smaller race gap between its performance in
predominantly white and majority-minority neighborhoods.

99.    Citizens' size and focus on mortgage lending in New England make it a good
comparator to Santander. Santander and Citizens are both regional banks with a primary focus
on New England. Among other states, both operate in Connecticut, Massachusetts, New
Hampshire, and Rhode Island. Citizens is headquartered in Providence and, like Santander, is
one of the five most active mortgage lenders in Providence, in Rhode Island, and in the Boston
CSA as measured by 2009 to 2012 loan applications. Both are also within the top 30 depository
institutions in the country as measured by total assets; as of December 31, 2013, Citizens ranked
24th and Santander ranked 30th. From 2005 through 2012, Citizens and Santander conducted
similar amounts of mortgage lending in Providence (Citizens made mortgage loans totaling $244
million and Santander made mortgage loans totaling $201 million); in Rhode Island (Citizens
made mortgage loans totaling $3.53 billion and Santander made mortgage loans totaling $2.12

billion); and in the Boston CSA (Citizens made mortgage loans totaling $14.3 billion and Santander made mortgage loans totaling $15.8 billion).

100.    In the 2006 to 2007 period, Citizens received an annual average of 336 mortgage applications from majority-minority census tracts in Providence and 122 mortgage applications from predominantly white census tracts in Providence.

101.    In the 2009 to 2012 period, Citizens received an annual average of 218 mortgage applications from majority-minority census tracts in Providence and 128 mortgage applications from predominantly white census tracts in Providence.

102.    This means that Citizens' applications from majority-minority census tracts decreased by 35% while its applications from predominantly white census tracts increased by 5%. This is a race gap of 40 points.

103.    In the 2006 to 2007 period, Citizens originated an annual average of 118 mortgage loans in majority-minority census tracts in Providence and 71 mortgage loans in predominantly white census tracts in Providence.

104.    In the 2009 to 2012 period, Citizens originated an annual average of 73 mortgage loans in majority-minority census tracts in Providence and 93 mortgage loans in predominantly white census tracts in Providence.

105.    This means that Citizens' originations in majority-minority census tracts decreased by 38% while its originations in predominantly white census tracts increased by 31%. This is a race gap of 69 points.

106.    Citizens' race gap, for both applications and originations, is significantly smaller than Santander's even though the two banks are similarly situated in terms of size, market share, and lending products.

107.   The Providence lending activity figures in paragraphs 77-82 for Santander and in paragraphs 100-105 for Citizens, and the corresponding race gaps, are combined in the following two tables:

| | | PROVIDENCE APPLICATIONS | | | PROVIDENCE ORIGINATIONS | | |
|---|---|---|---|---|---|---|---|
| | Minority population | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Santander | 0-29.99% | 74 | 84 | +14% | 51 | 64 | +25% |
| | 50-100% | 140 | 54 | -61% | 68 | 25 | -63% |
| Citizens | 0-29.99% | 122 | 128 | +5% | 71 | 93 | +31% |
| | 50-100% | 336 | 218 | -35% | 118 | 73 | -38% |

| | Applications race gap | Originations race gap |
|---|---|---|
| Santander | 75 | 88 |
| Citizens | 40 | 69 |

108.   As these figures show, Citizens has not had nearly as large a drop-off in lending activity in majority-minority census tracts as Santander.  Citizens' race gap for applications is only 53% as large as Santander's race gap for applications (40 divided by 75).  Citizen's race gap for originations is only 78% as large as Santander's race gap for originations (69 divided by 88).

109.   The four maps on pages 50-51 are based on the same data as paragraphs 100-105, as well as parallel data for surrounding communities. They represent Citizens' lending activity and are the equivalent, for Citizens, of the maps on pages 27-30 representing Santander's lending activity, but with the Citizens data combined to show all census tracts simultaneously.  These maps show that, unlike Santander, Citizens has remained an active lender in the majority-minority areas of both Providence and the surrounding communities.  In both time periods, 2006

48

to 2007 and 2009 to 2012, Citizens' applications and originations are scattered relatively evenly among predominantly white and majority-minority census tracts.



## 2006-2007

## 2009-2012

Loan Applications: RBS Citizens*
Providence, RI

*Loan points represent the average number of loan applications made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

Percent Minority

| | |
|---|---|
| < 30% | 50 - 79.99% |
| 30 - 49.99% | > 80% |

• Loan Applications

Roger Williams Park



## 2006-2007

## 2009-2012

**Loan Originations: RBS Citizens***
**Providence, RI**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Rhode Island Geographic Information Systems

**Percent Minority**

| | |
|---|---|
| < 30% | 50 - 79.99% |
| 30 - 49.99% | > 80% |

○ Loan Originations

▢ Roger Williams Park

110. The data and corresponding maps shown above demonstrate that Citizens' performance has been much stronger than Santander's in the majority-minority neighborhoods in and around Providence, and that Citizens' performance across neighborhoods in and around Providence regardless of racial demographics has been much more consistent than Santander's. This comparison between Santander and Citizens confirms that Santander's racially disparate pattern of lending activity is not the result of socioeconomic factors, such as a dearth of qualified borrowers in majority-minority communities, or other external factors. If such factors were the cause of Santander's disparities, Citizens would have disparities comparable to Santander's because they are similar lenders operating in the same market. The data demonstrates that Santander's racially disparate pattern of lending is instead the result of Santander's own decision making, *i.e.*, a decision contemporaneous to its takeover by Banco Santander to disinvest from Providence's majority-minority neighborhoods because it no longer has the option of making subprime loans there and to concentrate its efforts in whiter neighborhoods.

111. Citizens' pattern of lending activity in the Boston CSA is similar to its pattern in Providence. This further confirms that the large racial disparities in how Santander's lending activity has changed over time are the result of redlining, and are not the result of other factors.

112.    The Boston CSA lending activity figures for Santander and for Citizens, and the

corresponding race gaps, are shown in the following two tables:

| | Minority population | BOSTON CSA APPLICATIONS | | | BOSTON CSA ORIGINATIONS | | |
|---|---|---|---|---|---|---|---|
| | | 2006/07 average | 2009/12 average | % change | 2006/07 average | 2009/12 average | % change |
| Santander | 0-29.99% | 9,844 | 11,566 | +17% | 6,948 | 9,344 | +34% |
| | 50-100% | 1,182 | 632 | -47% | 585 | 373 | -36% |
| Citizens | 0-29.99% | 19,184 | 15,653 | -18% | 12,027 | 10,312 | -14% |
| | 50-100% | 1,410 | 1,157 | -18% | 523 | 524 | 0% |

| | Applications race gap | Originations race gap |
|---|---|---|
| Santander | 64 | 70 |
| Citizens | 0 | -14 |

113.    As in Providence, Citizens has not had nearly as large a drop-off in lending

activity in majority-minority census tracts in the Boston CSA as Santander.  In fact, while

Santander has a large race gap for both applications and originations, Citizens has actually

performed equally well with applications and originations in majority-minority census tracts as it

has in predominantly white tracts, resulting in no race gap.

114.    The eight maps on pages 54-57 are based on the same data as paragraph 112 and

are the equivalent, for Citizens, of the Santander maps on pages 36, 39, and 42-45 (but showing

all tracts simultaneously).  They show Citizens' consistent performance across census tracts in

the Boston CSA, including the Greater Boston Area, regardless of the minority population.



## 2006-2007

## 2009-2012

**Loan Applications: RBS Citizens***
**Boston Consolidated Statistical Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

☐ < 30%          ▨ 50 - 79.99%          ∘  Loan Applications

☐ 30 - 49.99%    ▨ > 80%



## 2006-2007

## 2009-2012

### Loan Originations: RBS Citizens*
### Boston Consolidated Statistical Area

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems (created May 2013)

Percent Minority

☐ < 30%    ▦ 50 - 79.99%
☐ 30 - 49.99%    ▪ > 80%

• Loan Originations



## 2006-2007

## 2009-2012

**Loan Applications: RBS Citizens***
**Greater Boston Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

**Percent Minority**

| | |
|---|---|
| < 30% | 50 - 79.99% |
| 30 - 49.99% | > 80% |

○ Loan Applications

Boston Major Parks



## 2006-2007

## 2009-2012

**Loan Originations: RBS Citizens***
**Greater Boston Area**

*Loan points represent the average number of loans made per tract per year.

Data Source: 2010 US Census, FFEIC HMDA Database, Massachusetts Geographic Information Systems

Percent Minority

- < 30%
- 30 - 49.99%
- 50 - 79.99%
- > 80%

- Loan Applications
- Boston Major Parks

115.    Citizens' consistent performance across census tracts in the Boston CSA regardless of the minority population again demonstrates that Santander's large race gap in the same geographical area is not the result of socioeconomic factors or a lack of qualified borrowers in majority-minority neighborhoods.

### 3.    The Much Higher Rate at Which Santander Denies Applications From Minorities Is Further Evidence of Redlining

116.    HMDA data also permits a determination of a lender's "denial rate" for residents of majority-minority neighborhoods and its denial rate for residents of predominantly white neighborhoods.  The denial rate is the number of mortgage applications denied divided by the number of mortgage applications received.

117.    The ratio of a lender's denial rate in majority-minority neighborhoods to its denial rate in predominantly white neighborhoods is the lender's "denial disparity ratio."  A denial disparity ratio of one means that the lender is denying mortgage applications from both types of neighborhoods at the same frequency.  A ratio above one means that applications from majority-minority neighborhoods are more likely to be denied than applications from predominantly white neighborhoods.  The higher the ratio, the more unfavorable it is to minority borrowers. Discrimination in underwriting, which results in high denial rates, is unlawful under the Fair Housing Act. *See* 24 C.F.R. § 100.120(b)(2).

118.    Santander's high denial disparity ratios are consistent with a pattern of redlining majority-minority neighborhoods while targeting its mortgage lending activity at predominantly white neighborhoods.

119.    In Rhode Island, Santander has a denial disparity ratio of 3.08 for the period from 2009 to 2012.  That is the highest denial disparity rate among the top ten lenders in the State. The collective denial disparity ratio for the top ten lenders is 2.12, and for all lenders it is 2.01.

120. In the Boston CSA, Santander has the highest denial disparity ratio for the period from 2009 to 2012 among the top ten lenders. Santander's denial disparity ratio is 2.86, while the collective denial disparity ratio for the top ten lenders in the CSA is 1.75 and for all lenders it is 1.71.

121. Santander's high denial disparity ratios are indicative of a deliberate and concerted effort to approve and provide loans for borrowers from predominantly white neighborhoods, while not doing the same for borrowers from majority-minority neighborhoods. Discrimination in the denial of loans based on the racial makeup of a neighborhood constitutes unlawful redlining. The data supports the conclusion that Santander is engaged in unlawful redlining.

### 4. Government and Non-Profit Officials Confirm that Santander Redlines Minority Communities in Providence

122. Attached to and incorporated within this Complaint are sworn declarations from senior officials at three non-profit community development corporations ("CDCs") dedicated to the stabilization and revitalization of majority-minority neighborhoods in Providence, and a state official responsible for community development in Providence's low- and moderate-income and minority communities. *See* Attachs. A-D. Their declarations further confirm that Santander is redlining Providence's majority-minority communities.

123. The CDCs (Community Works Rhode Island ("CWRI"), Stop Wasting Abandoned Property ("SWAP"), and Olneyville Housing ("OHC")) work to create affordable housing in and stabilize and revitalize Providence's majority-minority neighborhoods, including Elmwood, Olneyville, and South Providence. Attach. A ¶¶ 1-2, 6; Attach. B ¶¶ 1-3; Attach. C ¶¶ 1-2.

124.    Among other neighborhood revitalization efforts, the CDCs represented in the declarations create quality affordable housing for purchase and rental by building and renovating properties in majority-minority neighborhoods, including through the acquisition of vacant and abandoned properties. Attach. A ¶¶ 3-4; Attach. B ¶ 3; Attach. C ¶¶ 4, 12. SWAP works block-by-block, acquiring and rehabilitating multiple properties on a block to maximize the beneficial effects on a neighborhood. Attach. C ¶ 4. OHC focuses on first-time homebuyers. Attach. B ¶ 3. CWRI's comprehensive approach includes the creation of mixed-income housing and commercial, community and green space, all serving to catalyze private investment. Attach. A ¶¶ 2-3. The CDCs' efforts play a significant role in increasing property values, creating and maintaining stable neighborhoods, and increasing the opportunities for quality affordable housing in underserved minority communities. Attach. A ¶¶ 1-5; Attach. B ¶¶ 2-3; Attach. C ¶¶ 2, 4, 17.

125.    The purchasers of properties built and rehabilitated by the CDCs must obtain mortgage financing. By providing homebuyer educational programs to community members, the CDCs work closely with purchasers to assure that they are knowledgeable about financial services and prepared for the responsibilities of homeownership and having a mortgage. Because of the important role that CDCs play in identifying and educating qualified homebuyers in minority neighborhoods, working with CDCs allows lenders to identify minority borrowers who qualify for their prime lending products. Working closely with CDCs is an important way for lenders to make prime loans available in minority communities. Attach. A ¶¶ 8-9; Attach. B ¶ 7; Attach. C ¶¶ 3, 8, 12, 14. As a result, homebuyers who the CDCs work with present very little risk to lenders. Attach. C ¶¶ 13, 15.

126.    Numerous financial institutions support the CDCs and make loans to the CDCs'
clients and others in the communities they are working to revitalize. Attach. A ¶¶ 10-11; Attach.
B ¶¶ 4-7, 9-10; Attach. C ¶¶ 10-12. These lenders understand the value of the CDCs' homebuyer
education and financial readiness programs and actively work to qualify the borrowers for good
mortgages. Attach. C ¶ 16. Among other things, these lenders provide bilingual representatives,
actively engage in outreach by attending homebuyer classes and community open houses, and
support the CDCs with grant funds. *Id.* ¶ 12; Attach. B ¶¶ 4-7; Attach. D ¶ 8.

127.    RBS Citizens is among the lenders who are actively engaged with the CDCs and
in their communities, and even has a financial advisor who serves on OHC's Board. Attach. A
¶¶ 10-11; Attach. B ¶¶ 6-7, 9-10; Attach. C ¶¶ 11-12.

128.    The CDC declarants all testify that Santander, to the contrary, is all but entirely
absent from the communities in which their organizations operate. Attach. A ¶ 12; Attach. B ¶¶
8-11; Attach. C ¶ 18. They explain that Santander's interaction with them has been negligible,
that Santander does not engage in community outreach in their communities such as by
participating in loan fairs, and that Santander's absence stands out compared to other lenders.
Attach. A ¶¶ 12-13; Attach. B ¶¶ 8-10; Attach. C ¶ 18.

129.    The state official confirms the CDC executives' testimony that other lenders are
actively engaged in Providence's minority communities, but that Santander is not. Attach. D ¶¶
9-17. This official has worked with Providence CDCs since the mid-1980s and is very familiar
with lending in Providence's minority communities. *Id.* ¶¶ 5-6. His work involves the creation
of housing and economic opportunities, including by increasing home ownership and preventing
foreclosures. *Id.* ¶¶ 2-4.

130.    He met with officials from the Royal Bank of Scotland right after it acquired Citizens to discuss domestic Community Reinvestment Act standards, which play an important role in assuring that lenders do not engage in redlining, *id.* ¶ 14, and confirms that Citizens has maintained an active presence in Providence's minority communities and collaborated with CDCs to serve those communities' needs, *id.* ¶¶ 10, 16. Santander, by contrast, did not express any interest in domestic CRA standards upon acquiring Sovereign. *Id.* ¶ 15. The official explains that in 2006 and 2007, before the acquisition, Sovereign did invest in Providence's underserved minority communities, but that it cut back that investment significantly after the acquisition. *Id.* ¶ 11. He states that Santander is "not a lender I would turn to for help servicing the communities I work with" and is "absent" from those communities. *Id.* ¶ 12.

131.    Santander's disregard for U.S. fair lending laws and requirements is consistent with its pattern of unlawful activity elsewhere in the U.S., England, South America, and Latin America as set out in paragraphs 29-35 above.

132.    The declarants explain that the CDCs would be able to rehabilitate more properties, provide more quality affordable housing, and revitalize more blocks and neighborhoods if Santander made loans to their borrowers. Attach. A ¶ 14-15; Attach. C ¶¶ 19-20. If Santander were active in Providence's majority-minority communities where the CDCs operate, it would increase the availability of much-needed access to credit. Attach. A ¶ 14; Attach. C ¶¶ 19-20. This would benefit these communities in many ways, including by increasing property values. Attach. A ¶¶ 13-15; Attach. C ¶¶ 19-20.

## INJURY TO THE CITY OF PROVIDENCE

133.    Providence has suffered financial injuries as a direct result of Santander's illegal redlining of the City's minority neighborhoods. Providence seeks redress for these injuries. Providence does not seek redress in this action for any injury resulting from any other lender's reduction of credit available to minority neighborhoods.

134.    As shown above, the supply of mortgage loans in Providence's majority-minority neighborhoods has fallen significantly over the last several years. As a direct result there is an inadequate supply of mortgage credit, especially prime credit, to satisfy the needs of qualified borrowers in majority-minority neighborhoods. The supply is inadequate for prospective homebuyers as well as current homeowners seeking to refinance.

135.    In several ways, this inadequate supply of mortgage credit is suppressing the value of homes from what they would be in a market where sufficient credit is available.

136.    In a housing market where sufficient credit is not available to prospective homebuyers, demand for home purchases is reduced and housing values in the neighborhood decline to levels substantially below where they would otherwise be if sufficient credit were available. That is what has happened in Providence's majority-minority neighborhoods.

137.    Housing values also decline in a housing market where many homeowners cannot keep their houses without refinancing their existing mortgages, but sufficient credit is not available for refinancing. These conditions lead directly to distressed sales at reduced prices, *e.g.*, through foreclosures, short sales, and tax sales. It likewise directly causes an excess supply of houses on the market, which further reduces values in the neighborhood. This is also what has happened in Providence's majority-minority neighborhoods.

138.    The negative impact on housing values in Providence's majority-minority neighborhoods from the lack of sufficient prime mortgage credit can be isolated from the impact of other economic factors and is quantifiable. Illegal redlining by Santander since it was taken over by Banco Santander has caused a quantifiable negative impact on housing values because it has caused a quantifiable share of the reduction in the availability of prime credit. Each loan that Santander should have made but for its unlawful redlining would increase the overall volume of loans in the affected neighborhoods. Other lenders are not able to meet the need for prime credit, as reflected by the overall shortage in prime loans in majority-minority neighborhoods. This means that a shortfall in lending by Santander in minority neighborhoods causes a commensurate shortfall in the overall lending of prime loans in minority communities. Santander's illegal practices therefore significantly reduce the total number of homebuyers and home refinancers in Providence's majority-minority neighborhoods, and this deflects home prices downward.

139.    Residential property tax bills in Providence are based on property values. The suppression of housing values in the City's majority-minority neighborhoods – a specific portion of which is attributable to redlining by Santander – has therefore reduced Providence's revenue from property taxes. The amount of property tax revenue lost by Providence is quantifiable. Illegal redlining by Santander has caused a quantifiable portion of that lost revenue because it has caused a quantifiable portion of the underlying cause, *i.e.*, inadequate credit and suppressed housing values. Providence seeks to recover only that portion from Santander that is the direct result of Santander's discriminatory lending practices.

140.    Unlawful redlining by Santander has also caused direct financial injury to Providence by increasing the number of vacant residential properties in the City above what it would be otherwise. If Santander were not redlining majority-minority neighborhoods,

organizations such as SWAP, Olneyville Housing Corporation, and Community Works Rhode Island would rehabilitate additional vacant properties in majority-minority neighborhoods and return them to productive use.

141.    Providence must provide a multitude of increased municipal services at vacant properties. These include, *inter alia*, increased services from the City's police, fire, housing, sanitation, and health departments that would not be necessary if the properties were occupied. For example, the City must inspect, board, address structural defects at, collect garbage from, and respond to other public health and safety threats that arise at vacant properties. The costs of these and other increased services can be quantified on the basis of City records.

142.    Santander is responsible for a quantifiable portion of the costs of these increased services because it is responsible, as a result of its redlining, for an excess of vacant residential properties. This constitutes additional specific damages suffered by the City because of Santander's illegal lending practices.

*     *     *

143.    Santander's actions set forth herein constitute a pattern or practice of discriminatory lending and a continuing violation of federal and state law. Unless enjoined, Santander will continue to engage in the unlawful pattern or practice described above.

144.    Providence has been, and continues to be, adversely affected by the acts, policies, and practices of Santander, its employees, and/or its agents.

145.    The extent of Providence's injuries will increase unless and until Santander ceases to discriminate against minorities and borrowers in majority-minority neighborhoods.

146.   Santander's unlawful actions described above were, and are, intentional and willful, and/or have been, and are, implemented with callous and reckless disregard for federally protected rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

147.   Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 146 as if fully set forth herein.

148.   Defendant's acts, policies, and practices violate the Fair Housing Act, as amended, 42 U.S.C. §§ 3604 and 3605:

  (a) Defendant's acts, policies, and practices have made and continue to make housing unavailable on the basis of race and/or color, in violation of 42 U.S.C. § 3604(a);

  (b) Defendant's acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race and/or color, in violation of 42 U.S.C. § 3604(b);

  (c) Defendant's acts, policies, and practices have provided and continue to provide different terms, conditions and privileges on the basis of race and/or color in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

### SECOND CAUSE OF ACTION
### Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

149.   Plaintiff repeats and incorporates by reference all allegations contained in Paragraphs 1 through 148 as if fully set forth herein.

150. Defendant's acts, policies, and practices are intentionally discriminatory on the basis of race with respect to aspects of credit transactions and violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1).

## DEMAND FOR JURY TRIAL

151. Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant it the following relief:

(1)     enter a declaratory judgment that the foregoing acts, policies, and practices of Defendant violate 42 U.S.C. §§ 3604 and 3605, and 15 U.S.C. § 1691(a)(1);

(2)     enter a permanent injunction enjoining Defendant and its directors, officers, agents and employees from continuing to publish, implement, and enforce the illegal, discriminatory conduct described herein and directing Defendant and its directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3)     award compensatory damages to Plaintiff in an amount to be determined by the jury that would fully compensate Plaintiff for its injuries caused by the conduct of Defendant alleged herein;

(4)     award punitive damages to Plaintiff in an amount to be determined by the jury that would punish Defendant for the willful, wanton and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5)    award Plaintiff its reasonable attorneys' fees and costs pursuant to 42 U.S.C.

§ 3613(c)(2) and 15 U.S.C. § 1691e(d); and

(6)    order such other relief as this Court deems just and equitable.


Dated: May 29, 2014

_____

Jeffrey Padwa (#5130)
City Solicitor,
City of Providence
444 Westminster Street, 2nd Floor
Providence, RI  02903
Phone: 401-680-5333
Fax: 401-680-5520
Email: jpadwa@providenceri.com

Sean Creegan (#8829)
Assistant City Solicitor,
City of Providence
444 Westminster Street, 2nd Floor
Providence, RI  02903
Phone: 401-680-5333
Fax: 401-680-5520
Email: screegan@providenceri.com

John Relman*
Glenn Schlactus*
Jia Cobb*
Relman, Dane & Colfax PLLC
1225 19th Street, NW
Suite 600
Washington, DC 20036
Phone: 202-728-1888
Fax: 202-728-0848
Email: jrelman@relmanlaw.com
Email: gschlactus@relmanlaw.com
Email: jcobb@relmanlaw.com


*Pro hac vice applications to be filed